Good morning, Your Honors. Anthony Kornarens for Appellant Babette Ory. The briefing in this case has been extensive, and I do not want to simply repeat what's in the briefs. Rather, I'd like to give the Court an overview, be available for questions, and reserve time for rebuttal. Well, I guess the question that I'd like you to address is the one that Judge Minella hinged her decision on, and that is, why doesn't our decision in Danjaq spell the answer to the question posed by Ms. Ory's appeal? Danjaq is a very important decision, and in fact it provides an extensive amount of guidance to the Court. And under Danjaq, the summary judgment should be reversed. So you think it supports your position rather than spells the death now? Yes, absolutely. I'm all ears. Good. Okay, here we go. Danjaq talks about the new work's exception to laches and says that where the work is virtually identical to what has come before, laches doesn't apply. Here, of course, and I say of course, the work is not virtually identical under any circumstances. We're dealing with a brand-new recording that was made in 1999, released in 2000, suit was filed in 2001. The new recording under Newton v. Diamond, the new sound recording, is a separate copyrightable work, and accordingly there's a separate act of infringement. Let me ask you, if we were to accept that argument, what would the trial look like? Who would be called as witnesses in order to both establish the infringement and establish the defense to the infringement? If you accept the argument on the new work argument, then we don't have a laches issue in the case at all. Right. Assuming we get over the laches hurdle, and I'm trying to lay my question out as clearly as I can, one of the principles that the doctrine of laches protects is the parties from stale evidence and key witnesses who have died, and how would you prove up the new infringement without relying on the same evidence that you would have had to rely on going back near 36 years? I understand the question, and the answer is simple. You have a certificate of registration with the Copyright Office that gives rise to a presumption of validity. You have an argument on behalf of the defendant, presumably, that Kid Ori did not author the song in the 1920s. How would you prove that if everybody's dead? Again, presumption of validity, prior art. They can go back and look for other songs, put it into evidence. I dealt with this in the LeVere versus Abko case. I've thought about it a lot in terms of authorship as well. It's basically prior art. OK, and the certificate and prior art, meaning let's find a song that's like Muskrat Ramble. Let's show that what McDonald took, or Mr. McDonald took and incorporated into Fixin' to Die Rag preexisted the writing of Muskrat Ramble. But I want to focus, I want to respond to your question, but I also want to point something out. That problem existed as of 1971 and or 1973, depending on how you look at it. If you ignore the fact that there was a new infringement in 1999, and there was, put that aside for a minute. Ori's predecessor learned about this in 1969. Louis Armstrong was dead as of 1971. Kid Ori was dead as of 1973. Those are the persons whom the issue of authorship turns on if you accept the hearsay evidence or the double hearsay evidence concerning Louis Armstrong. Really, the key to this is Kid Ori, and that's why this is a very important public policy case. Is this court going to, under the guise of the latches defense, and I'm using the word guise very calculatedly, make it nearly impossible for somebody to enforce an old copyright on the grounds that the author has passed away and therefore the evidence isn't available? It's very easy in a copyright case to challenge someone's creation of the work. It's standard operating practice. And I don't mean to denigrate it, but that's what happens every time. But it has to be proven. Can you help me with that? I don't understand the technical term of riffs. And I mean, are we essentially looking at sheets of music that can be superimposed on one another by the experts in order to tell whether it's the same composition or not? Is that how you prove it up? You prove it up through sheets of music, deposit copies of the copyright office, but also sound recordings. What about the radio interview? The radio interview would be helpful as well. But that's what we're talking now. Yes, but I thought the court's question focused on whether or not Kid Ori authored the song in the first instance. Clearly, the radio interview is an affirmative admission on Mr. McDonald's part or could be construed as such that he copied Muskrat Ramble and he's alive, by the way. And then he's he's he's present. He can talk about how he wrote it. He can change his story if he chooses to. He can do whatever he wants. He's available. So, again, the latches issue here focuses on the authorship of the underlying work, which, by the way, was admitted in the answer. Excuse me, undisputed material. Fact number one admitted that Kid Ori wrote Muskrat Ramble in 1921 or 1924, which is why this is very ironic and which is why I think Dan Jack is actually helpful in that regard. Now, in terms of infringement, McDonald is there. You have the records that were made in the 60s. And again, I'm putting aside the new uses in the 1990s. You have experts, competing expert musicologists saying Missouri's expert says 68 percent similarity. Mr. McDonald's expert says far less common elements. This is how you prove copying. You also have McDonald's, as the court pointed out, admissions. You have the history, his past knowledge of Muskrat Ramble. You have what's common in common practices in the music industry at the time. Insofar as willfulness is concerned, all of these elements are in the record and present. But we do not want the tail to wag the dog here. Willfulness is important insofar as an exception to latches is concerned. And it's important insofar as damages are concerned. You don't need willfulness if you have a new use. And you don't need willfulness if another exception to latches applies. Let me challenge. I guess I am back to latches again. If your argument is, as it has to be, that the music in 1999 was identical or infringing from the 1921 or 1924 original composition. And if the evidence is uncontradicted that there was knowledge in the 1970s of the infringement, why shouldn't the Danjack Rule apply to hold that whatever happened in 1999 was essentially just another iteration of the infringement that the plaintiff or the successors or predecessors had known about for 36 years? Okay. Well, part one, the Danjack Rule does apply. Part two, applying the Danjack Rule leads to a completely opposite result than that reached by Judge Minella. Why? The rights are infringed upon in a different fashion. One reason, there's a new infringement. It's a separate sound recording. Another reason, a new derivative work is created under the Copyright Act and under Mirage. It's different from a new version of a James Bond film involving a different plot line, although using familiar characters like 007. Well, two reasons. Number one, in Danjack, the Bond films were old. The infringement had to do with putting those films out on a different DVD. Two, characters are not necessarily copyrightable. Plot line is not necessarily copyrightable. It's the combination of all of the elements. Three, they can- Some of the infringing, the alleged infringing films were some of the more recent Bond films. I have to admit, I didn't chart out the name of each of the, I guess it was the eight or 12 films that Judge McEwen focused on, but some of them, by my own recollection, were fairly recent. Well, they weren't that recent, but they were certainly more recent than 30 years. And yes, there were eight or 10 in a series. But the point is, and Danjack confirms this by citing to this circuit's decision in Hampton with approval, if the use isn't virtually identical, and that is the Danjack rule, Ben Latch's will not bar prospective injunctive relief, a claim for prospective injunctive relief. Hampton versus Paramount Pictures confirmed in Danjack. Now, it's possible, Your Honor, that a court could say, given the fact that there may have been some reliance on inaction, that will affect the damages calculation in the case. Danjack is ambiguous. You sought past damages, right? You were not asking just for prospective injunctive relief. We were asking for both, Your Honor. So the answer to your question is yes. But what the court did is it said, because McDonald's use has been consistent all along, that's the word used by McDonald and the word used in the court's order, the Danjack virtually identical test is met. And I submit that virtually identical and consistent are two very distinct concepts. And what the court did is completely contradicted by Hampton. It's completely inconsistent with Hampton. And again, Danjack did not disturb Hampton versus Paramount Pictures. Danjack cited it with approval and distinguished it. And that's a very important point here. Now, Your Honor, turning to the prejudice issue, if I may briefly, Mr. Armstrong passed away in 1971. We don't know that he would have had anything whatsoever to say about authorship. The only thing we have him captured saying on videotape or on film is that Kid Ory wrote the song. The only showing that Armstrong may have contradicted the point is double hearsay. It's inadmissible. Is this a statement about, you know, I wrote it, but he copyrighted it and he got the royalties. And that's all I'm going to say about that. I wouldn't even call it a statement, but it's the double hearsay that appeared in Down Dean Magazine, Your Honor. So. So, yes, with that, I understand. And that is that is the portion of the record we're talking about. It should not have been admitted, in my opinion. Now, what else do we have? We have a saxophone scale book. That thing is shrouded in mystery because we know that Missouri claimed to have it and it wasn't turned over in discovery. We know that there's some evidence about maybe it's around. Maybe it isn't. We have an affirmative admission. And I'm pointing out all these ambiguities for a reason. We also have an affirmative admission. I'm missing an action. We don't know what happened to it. We don't know what happened to it, but we do not know that it's unavailable because of any delay in filing suit. And that's the important point. But the point is, nobody can find it. Isn't that the fact? No, that's not the fact. You have it. I don't have it, Your Honor. You know where it is? I don't, Your Honor. I truly don't. I'm not playing games. Yeah, you are playing games. I mean, either you have it or you don't. So. Well, let's. I understand why you can't answer that question directly, counsel. I can't answer the question directly because there's been conflicting information given about it. There are different versions of what happened. But let's focus on something that McDonald said. And this is in one of his Undisputed Material Facts. We'll never know what relevance that book has because Kidori is dead. Well, again, Kidori passed away in 1973. And it's a scale book. Everybody agrees it's a saxophone scale book. That's a practice book. There's nothing protectable about a scale book. And that's not me speculating. Everybody agrees it's a scale book. But before we can make those conclusions, don't we have to see what it is? No, because everybody admits it's a scale book. It's like saying I had a book. It's a primer for the alphabet or I had a dictionary and I wrote a song based on a dictionary. And that's where the court, I think, got sidetracked. I don't think the court focused appropriately on how probative the evidence would have been. And a causal relationship between any delay and the unavailability of the evidence. There was no affirmative evidence whatsoever that that book even existed as of the 1960s. Counsel, it seems to me that you're putting the trial judge in an impossible position. You're asking Judge Minella to rule on the admissibility or relevancy of a piece of evidence that no one can produce. So that anybody can offer any testimony to either authenticate it or to confirm what you just represented to us in terms of the fact that everyone agrees as to what it was. We've got a dead witness who would be the key person, I assume, to lay the foundation for the admission of it. Why can't a trial judge take that into consideration in deciding whether or not it's a critical piece of evidence? Because under DANJAC, in order to invoke latches, the defendant must prove that the delay was unreasonable and caused prejudice. You need some evidence in order to make that proof. If you don't make that showing, you do not meet the DANJAC test. And with respect, Your Honor, I think what happened here is that Ms. Ori was put in an impossible position. Let's look at what would have happened had she filed or her predecessor filed the case in 1973. The same thing, evidently. Perhaps even in 1969. Well, we don't know because we don't know when the evidence went missing. We know that Kid Ori passed away in 1973. But we don't know what happened to the book. The book is a scale book. It may not even have existed as of the 60s. And that's why I believe that the judge was taken in by a smoke-and-mirrors defense. And again, as a matter of law... Maybe I'm being taken in by the same, but I think I can understand where she was coming from. And I'm trying to understand why it was so unreasonable for her to focus on issues like this when she's trying to make the prejudice determination that the law tells her she has to make. Oh, you have to focus on issues like this. Of course she was looking at the right things. It's just the way the court looked at it was erroneous. I'm not being critical at all of it. Is there an abuse of discretion standard on issues like this of evidentiary admissibility and prejudice? Or is it a pure question of law? Or is it a question of mixed law, in fact? In terms of admissibility of evidence as to the hearsay, abuse of discretion as to everything else, de novo. Absolutely de novo. And we don't have really mixed questions of law and fact here because what we have is a summary judgment motion that never shifted the burden, that did not overcome the hurdle of new uses, did not overcome the hurdle of lack of willfulness, and did not show evidentiary prejudice. It alluded to it. A jury could consider this evidence and perhaps rule in a certain fashion in favor of McDonald, putting aside the new uses issue. The judge, however, weighed the evidence, determined what was important and what wasn't important, and I submit crossed the line into the domain of the fact finder. I need to reserve my remaining two minutes for rebuttal. Thank you, Your Honors. Thank you very much. May it please the Court. I'm Daniel Keegan, Counsel for Defendant Joe McDonald. With me is Jay Giusti, who's worked well on the briefings. If ever there were a case that should be barred by laches, this is it. The laches is the principal concern. There are five areas I want to briefly discuss. And then before you conclude, let's assume that was intentional copying, and if so, would laches apply? You don't have to do it, but I thought you might add that to your... The issue of intentionality, willfulness, and the exception I will get to. It's one of the five. Those five areas are the assertion that there is a new use, the issue of what does it really mean when there is a willfulness exception to laches, Muskrat and Ramble as a derivative work itself, as admitted by Kid Ory in the liner notes. And it was not a scale book, in terms of what he says. He says he was playing scales and arpeggios, which I understand are a series of notes. We have no idea what that was. Everyone does not admit it was a scale book. And in fact, some scales would be highly protectable. As I remember Bach's six solo suites for cello, Pablo Casals, sounds almost like a scale or so. Parts of Brandenburg Concertos could be seen as a scale. We're talking about a part of something that is alleged. Certain new uses, willfulness, Muskrat and Ramble as a derivative work, question of fees and standards. We agree with counsel for plaintiff that Danjak is an important case. We think virtually everything that's asserted in this case can be decided under Danjak. In Yarrow, Yarrow formulas we like very much, although it's a trademark case. It addresses and overcomes almost every exception that plaintiff seeks to overturn the wise judgment below. Counsel, let me tell you my approach to the case, and it might affect what you deal with. The sole question, as I see it, is whether summary judgment was appropriate. We don't have to decide the merits. We don't have to decide who wins or loses. All we're asking now is whether there were controverted issues of fact that should have gone to trial. So that's my focus on this case. There were no material issues of fact in dispute, Your Honor. The fact that plaintiff is trying to reinterpret, put a different gloss on the fact is not a material fact in dispute. So I believe there were no material facts in dispute. And the undisputed facts in the case would support latches. Let me give you an example of what bothered me in reading the briefs. Yes. In deposition testimony, your client testified that he was not playing the chords to any other song when he wrote Fixin. In the 2001 radio interview, your client said that he was playing a riff from Muskrat Ramble on his guitar when he began writing the lyrics to Fixin. Now, why doesn't this inconsistency create a genuine issue of material fact? You must be reading from something created in terms of that quote, I believe, from a brief by plaintiff rather than the exact words that were said. Because I was reading from the excerpt of Record 1099 and the excerpt of Record 14. I don't believe that was created by defendant. And in fact, there are two places where defendant, excuse me, where plaintiff quotes what was said in the interview tape. And both of those are erroneous. The statement of what was actually said on that tape is Exhibit 29 of defendant's deposition. And in there, and it's at page 150, 151 approximately of his deposition, there are the lines. I'll see if I can get that in a moment. It says, it was sort of a riff. Not that it was. And what he wrote immediately after that were the lyrics. Also around page 151, there's clarification. He did not write the music down for several days, probably more than a week. Now I'd like to contrast that with what Kid Ory in the liner notes says himself about how Kid Ory wrote Muskrat Ramble. He was studying saxophone, a book that had scales and arpeggios. And all of a sudden he had this inspiration and he wrote down the music, did something with some notes, that became Muskrat Ramble. There is a remarkable both parallel and difference. The parallel is Kid Ory has admitted that what he wrote is a derivative work from a book that we no longer have. Exactly what part was his original contribution that would support copyright registration, we don't know. We have never said that Kid Ory might not deserve a copyright for the work as a whole. Don't know that. But we are not claimed to be a wholesale pirate who takes Muskrat Ramble as a whole, puts it on a record and sells it after our license expires. That's what willful infringement is. That's what deliberate piracy is. That's one of the exceptions to the latches where the burden of proof would have been shifted on the other side. What we have is some amorphous floating. There's something in that song someplace that my father Kid Ory did and yours sounds like it and therefore you're infringed. And in fact, I would submit under the Croft test, it is impossible for plaintiffs to prevail. It would be futility because there's absolutely no way under the objective extrinsic test to find what's the protectable part that Kid Ory contributed. As opposed to what was pre-existing. In terms of prejudice, it is not just Kid Ory. The people who have witnesses, without even talking about reputation or identity as Gerald does. Kid Ory died. Barbara Ory, his second wife, died. But that Ory's testimony says she was very involved in his affairs, cleaned up his image for the public and the like. Was typing his autobiography, which also disappeared or wasn't produced. George Simon also died, who would be involved in the MCPS information and the like. Have I answered that question? I've gone off a bit, I believe. To some extent. Let me see if I... You're saying what I appeared to have found in the excerpts of record was erroneous. Correct. Exhibit 29 of Joe McDonald's deposition is the quote, and it is the quote that counsel for plaintiff agreed was exactly the way he got it. There are slight differences in wording. And what he says is... Well, let me see if I can get back to it at the end. You are not getting the exact quotes. There are numerous errors like that. There's one in the record where it says we're making something up in effect because we don't cite the record. It's the argument section. Virtually, if not everything, is cited to the record in the facts section. Let me see if... You've got plenty of time, and I don't want you to run by it. But at some point, I gather your position is that this is a case to affirm. Yes. And I gather you have some one, two, three, four bases for it, and it would help when he comes to rebut if you'd outline those. Because as I understand his argument, he's more concerned about latches and the argument on latches, I gather. Latches is an important one. Go ahead and tell us why you think... No, it's fine. When you get to it. It's right up next, Your Honor. Speaking of standards, the grant of summary judgment is reviewed de novo. And whether latches is applicable in this type of case is de novo. In rebeating, in bankruptcy, the question is dischargeability. But virtually everything else is an abusive discretion standard or a clear error standard. Those two seem to be both in Danjak, Yarrow, many other cases. The difference between them has not been decided. And every case I've read has said it doesn't make any difference or a high standard of deference for the judge below. The application of latches is reviewed for abusive discretion or clear error. Evidentiary decisions are reviewed for abusive discretion. The award of fees is reviewed for abusive discretion. All the material issues in this case are reviewed for abuse of discretion. And there was none. Let me go through some of the allegations. New use. Even assuming that's an issue. Joe McDonald has been singing and performing the same song for now 40 years. And earning quite well. Excuse me? Earning quite well. Actually, no, Your Honor. Well, $30,000 a year for something, isn't it? His deposition would show that he has effectively been blacklisted. That his song was prohibited from being on the airs. It's a political song. He's never been big time. He's not Mariah. He is working very hard, but not... Excuse me. I was referring to Musgrave Ramble. Oh, oh. I'm sorry. No, go ahead. Yes, I believe that has been earning well. And much more than reported, as shown in some of the discussions about financial hardship and the like. The question of this being a new song is strange. One, Nancy Sinatra, anybody who sings really, has slight variations when they sing. Joe McDonald's song does change a little bit. Next stop is Vietnam. Probably changes in time. Unfortunately, as conditions give it opportunity. But that's the lyrics that change. It's the lyrics that change. The song, the music, is another issue. But what occurred to me only last night, and sometimes what's most obvious is hardest to see, is plaintiff's own expert, they claim, Mr. Lash. We think there's some Dilbert questions with that. Professor Eskalin had some other questions. But on the front page of his report, he says Musgrave Ramble versus, quote, I am, I feel like I'm fixing to Iraq. Country joke. 1967, Vanguard Records. Why do your expert report on Musgrave Ramble, which he didn't do from the deposit copy, but from some amalgam? With a 1967 record. If, in fact, the point either down below, which wasn't even now, is that there is some new use. I believe this says implicitly, let's treat them all the same. That was where I was going with questioning to opposing counsel. I'm trying to envision what this trial would look like. And it seems to me that there has to be a heavy reliance on what I will refer to as old evidence in order to establish the infringement. There has to be a reliance on old evidence on both sides. And I believe there's an insurmountable barrier to overcome. When Kid Ory himself said he derived, it's not his words, but he was noodling around scales and arpeggios, which can't be copyrightable. There is some tune there we have no idea what it is. We cannot separate out. In terms of what happens with the prejudice after this long years, Kid Ory did not make any complaint. The copyright owner made no complaint. Plaintiff made a complaint weeks before she was entitled to. She didn't even get rights. Her termination of the copyright wasn't effective until October. It was filed in September. So there's no way to separate out. There is no way to pass that Croft test. And the question of what happened, willfulness, I will get back to in a moment. I must say, listening to the records of both, there is a very similar section. If pointed out, one can find the similarity in the sections. There are psychological principles, among other things, that say if something is pointed out, you can find similarities there. But the key issue is, are those similarities something originally contributed by Kid Ory, or is shown very well by Professor Eskelen? Those are themes, sounds of the riffs, American Beauty, Dardanelle, that were around at the time. If you look at, virtually contemporaneously, one of the stomps, it sounds similar. The question is not, are they similar? On the Croft test, you have to say, what's protectable? And there's no way we can tell what's protectable. Let me move on to them. In terms of whether there is a new use or not, Judge Vanilla, I believe quoting Danjack, said, the principle of willfulness exemption. The principle does not apply where the feared future infringements are subject to the same prejudice that bars retrospective relief. It's not a question, is it a new use? Or is it repackaged? It's a fundamental equitable question. And equity developed because looking at the narrow language of a word and taking a word out of contest was creating unjust results. So they develop equity. Is the prejudice to Joe McDonald the same in the future? It's the same song. More on the willfulness, it's sometimes described as deliberate piracy. I think the Bolton case, Three Boys Music, they were found unconscious copying. They were found infringing but not willful. It is not willful. And in fact, I would say there is no way than a 23-year-old kid putting together a rag out of the rag genre could know that that was infringing. There's no way he knows what is a stomp, what is earlier themes, what if anything was proprietary. There's no way that could be infringing. It is not an easy question for judges and experts now to decide. You get willfulness when you wholesale copy a videotape of another program or run your license out. The derivative copy I've talked about. Briefly on the questions of fees, the Rule 68 is available to a defendant. And the fogarty issues were discussed by Judge Manilla. No one of them is essential. They can weigh them as they see fit. In terms of prejudice, on Joe McDonald's deposition about page 117, 10-16, plaintiff admitted that Joe McDonald was so identified with the song that he has to sing it whether he likes it or not. And it's a fundamental aspect and part of his career. And the country Joe would effectively be stopped, more or less, and humiliated if he were not allowed to perform that song. That's a virtual direct quote. There's no question of prejudice evidentiary in terms of economic harm to him. In terms of summary judgment, the undisputed facts are, he did or he derived his song from something else. There's no way to separate that out. It's been 30 some odd years. Prior copyright owners and plaintiff clearly steps in the shoes of the prior predecessors and interests, made the wise decision not to make any fuss about this. The song is not something that was hidden or unknown. It was, for a very brief time, well known. And all the ownership, both Kid Ory, after he died, Barbara Ory, who had an income ownership but not the copyright, and George Simon were all aware and chose to take no action. MCPS was aware of that determination, which is relevant for many purposes. Are there any questions I have not addressed yet? Thank you, Your Honor. Your Honors, concerning the issue of intentionality, Dan Jacks writes to Columbia Pictures versus Krypton, and they both adopt the standards set forth in 17 U.S.C. 504 C.2. To refute evidence of intentional infringement, the defendant has to establish both the good faith belief in the innocence of his conduct and that he was reasonable in holding such a belief. Here we do have evidence of willful infringement. McDonald did not establish those factors. The evidence of willful infringement consists of a 68 percent similarity, inconsistent stories as to how Muskrat was created, failure to disclose Muskrat on the copyright registration for Fixon, knowledge of Muskrat at the time he wrote Fixon. He did not establish reasonableness in holding the belief. The only thing he said was, it wasn't my intention to rip off Kid Ory. That doesn't show that his conduct was reasonable, and that is a jury issue. In other words, the jury should have considered or should have been permitted to consider whether or not the infringement was intentional. The Court, I believe, got sidetracked on the advance notice issue. Danjak, of course, focused on advance notice because there was a prior existing relationship between the parties, and the defendant in Danjak claimed to have a belief that that defendant had permission to use the work. Excuse me. Go ahead. Judge Tallman asked you earlier, what would the trial, what would be tried? What would the trial be? The trial would be McDonald testifying as to whether or not he copied Fixon. As my opposing counsel pointed out, you have expert musicologists that will discuss the similarities. Let me ask you another one. What would be the primary question at trial? In terms of the lashes issue or what issue, Your Honor? I don't quite know how to answer. You are advocating the trial, and I assume you have some basis for it. Of course. What would the trial be about? I'm sorry. The trial would be about McDonald having infringed on the copyright when he made his 1999 recording and the monies he earned from that recording. We would have to prove authorship. We would prove authorship by using our copyright certificate. And we would rebut their contention that he didn't write the song by pointing out the obvious. That is that arpeggio is a chord broken out over notes and that a scale is a scale. We would then figure out how much McDonald made from the use. We would try to prove willful infringement in order to enhance the damages. We would do so with reference to his conflicting stories as to how the work was created. We would ask for an injunction with respect to the 1999 recording. Everybody admits and agrees that the 67 recording isn't a part of the case, notwithstanding the way the expert witness approached the report that is admitted in the briefs. Would misuse parties not be present? Actually, they would, given the fact that we're limiting the case to the 1999 recording. McDonald acted as the artist and the record company and the distributor. We are not suing on the 67 recording. If we were, we would have to bring in other parties. Or at least they would have the right to intervene under Levere versus Abko. Abko versus Levere. They may not be indispensable. I tried that argument last time I was here. Thank you, counsel. You are out of time. And the case just argued is ordered, submitted on the brief. We'll take a ten-minute recess and hear argument in the remaining cases. Thank you.
judges: Farris, D.W. Nelson, Tallman